the court. Mr. Gufford. The standard in this case is on a totality of the circumstances case, at least the search under Terry is. We must have some kind of objective, reasonable basis for that search. The problem is, in this case, is that we have two versions of events and the district court, those versions of events first are based upon the testimony of the security guards at the Western Village Casino and the police officers who responded to the call of the security guards. And the other version of events is based upon the videotape of those events. Those events, the testimony of the officers and the videotape differ. Wasn't that for the trial court to resolve? It was. How would the trial court resolve it? I don't believe it did, Your Honor. Not necessarily by making its conclusions. Well, Your Honor. I've seen the tape. And frankly, I'll tell you, it doesn't help your side at all. I mean, if that's not suspicious behavior by your client, I don't know what is. The tape does not contain a good deal of things that the officers testified. You mean when the car goes partially behind the trees in the building? No, I mean when he crosses the street and he is not clutching the fanny pack as the officers say he is, the security guards say he is. He does not clutch that fanny pack. He does not pull on the door of any handles of any vehicles. It just seems to me that you're asking us to reweigh the evidence, which is not our job. It's to take a look at the evidence and determine what its conclusions mean. I mean, aren't you asking us to reweigh the evidence? You say there's two versions of it. Well, I'm not asking you to reweigh the evidence. What I'm asking the Court to do is look at the contradictory evidence that I don't believe that the district court truly took a look at when it -- Why not? The district court saw all this and heard all of this. Well, I don't understand. You say the district court did not look at the video? It did look at the video. However, it didn't change any of its conclusions or findings of fact that it based its decision of reasonable suspicion on. There was no new opinion issued. There was a whole set of facts, including the fact that he furtively looked back at the officers, that he clutched the fanny pack as the officers were coming to him. The district court made no findings of fact concerning those issues or those facts at all. What findings did the district court make? Well, the findings that the district court made were in the first order. And the first order said that when the officers showed up, he was -- he crossed the street, he looked back at the officers, he hurried away from them, he did not respond to their calls, he was clutching the fanny pack. None of that was true. None of that was true. What you're saying is that those findings were clearly erroneous? Those findings were clearly erroneous. And if those support the finding of reasonable suspicion here, then, I mean, how can the videotape --- the videotape does not lie. Well, I understand your argument, but we're faced with the dilemma of are there sufficient facts remaining that the videotape does not challenge which are sufficient for reasonable suspicion? I understand that. And then we have the testimony of the security guards themselves who say he's just kind of wandering around the parking lot like he's lost his car. He has his own of the security guards. One of the security guards, yes. Officer Warner. He has his hands folded in front of him. He's not clutching the security pack like the security guards say he is. I mean, even the district court --- On tape? That's on the tape. The security -- in fact, the district court in its review said he either has his hands folded in front of him or behind him as he's walking through the parking lot. The fact is, is that one of the things that is very troublesome in this case is that the security guards call up the Sparks Police Department and say, there's a gun in this fanny pack. We believe there's a gun in the fanny pack. There is nothing at all to support that conclusion. I mean, there's no indicia of reliability that there's a gun in that fanny pack. How do they reach that conclusion? The district court based its findings pretty much on that, also on that conclusion by them. There's testimony that the fanny pack was hanging low, that the fanny pack was high. All of that is contradictory. How do we resolve that? The fact is, is that there is no indicia of reliability that there was a gun in this fanny pack. At all. The other thing that is troubling in this case is that Mr. Avery crosses the street. He is completely removed from any activity in the parking lot of the Western Village Casino. He is essentially gone. There is no immediate activity when he crosses the street, any indicia of any immediate criminal activity on his part. He's gone. He's leaving. He's away from the scene. He's on his way. He's not attempting an auto burglary. He's not looking into cars. And in fact, as the officers testify, the security guards testify that his behavior was not really indicative of any kind of suspicious or criminal activity. He was just there. If I'm a police officer and I'm walking through a parking lot and I look into a window, that's considered plain view. And yet it differs for an average citizen? I mean, certainly that's a rhetorical question. But the fact is, is that we do allow behavior on people's parts, even if it's odd behavior, that we don't allow police to violate people's Fourth Amendment rights. We have a man here who was stopped. Who owns the parking lot? The parking lot is owned by Western Village Casino. So he was on private property? He was on private property. That's correct. And then he's leaving private property. He's across the street. He's walking away. He's not committing any crimes. There's no indication that he was attempting to commit any crimes when he crosses the street. In fact, any reasonable suspicion should have ended at that point. And yet the officers chase him down. And the fact is, is that he's put in handcuffs almost immediately. I believe the videotape shows within 23 seconds. Well, he was behaving as if he was trying to make a break for it, and he didn't do what the officer said he'd do. And he was twisting his hands as if he was going to run. That's what the officers testified to. That's what the district court found, isn't it? Well, that's correct, but that's not what the videotape shows. Well, you know, again, I also have seen the videotape. I don't understand where you've got this great conflict. I mean, if anything, the videotape corroborates the events that were going down. But the videotape does not show that he was running from the officers. It does not show that he was clutching the fanny pack. It shows that within 23 seconds of the officers – I mean, they call him. He turns around. He responds to them. He does not run away from them. He does not clutch the fanny pack, as the officers testified. He puts his hands on his head. He reached for it. His hands went up. He was furtively looking around, acting as if he was trying to escape. Handcuffs were on for less than three seconds. And right? Right. He says, fine, search the fanny pack. Well, there is – the record is difficult on that point. The fact is, is that he does not challenge – or he does challenge his consent, but there is no finding on the record that the fanny pack – that any testimony that he did not give the consent. Okay. Would you like to reserve the rest of your time? I would, Your Honor. Mr. Gifford. May it please the Court. My name is Robert Don Gifford. I'm an assistant U.S. attorney for the District of Nevada, and I represent the United States, and I represented the government at trial and through portions of the hearing, the hearings in regards to Mr. Avery. I believe that where the – I would agree with the Court's observation that what is being asked of it is to make new findings of fact. I think where the difficulty lies for the appellant is that they believe that the videotape encompasses all of the behavior that was noticed by Western Village Security, the casino that first initiated all this. On the excerpts of record starting at page 160 or leading up to 160, the security officer at Western Village made all these observations about watching Mr. Avery go through the parking lot, wander through the casino, in and out the parking lot, tugging on doors. On page 160 is when he notifies surveillance, and that's when the cameras kick on. So I believe that that's where the conflict lies as to why there's a concern about any conflict as to what happened, what was being observed versus the videotape. The fact is that there were many things that happened that happened prior to the casino surveillance turning on its cameras to observe Mr. Avery going in and out of the parking lot. The casino had suffered several auto burglaries, so that's why they were concerned. When they see an individual who seems to be strolling up and down through their parking lot tugging on doorknobs, that arises the concern. And the security officer even testified that he had notified the surveillance that he believed that the individual was carrying a firearm into a fanny pack, that he was familiar with how the firearms would usually weigh on someone, how it hangs a certain way, and he did have a concern. And then when the police officers arrived, they made their own observations as well. The videotape corroborates nearly every single thing. The only things that it does not corroborate are those minute details where the camera is so far away you have a hard time seeing what has happened. One of the police officers testified that when he put the cuffs on him, or was trying to put the cuffs on him, and said, you're not under arrest, this is for detention, I'll explain everything in a second, that the defendant made some sort of move to try to slip out of it that he said that we as police officers are taught, and that that created other concerns. Moving on to the issue that I think that the court may be most concerned with is the sentencing issue. This was a mandatory minimum case. The defendant conceded to the four prior crimes of violence. There was a fifth one, but the court went ahead and ruled against that fifth one, but we only needed three. The only question I believe that's before this court is whether or not the court felt mandated by the guideline sentence. It was a mandatory minimum of 15 years, which would come out to be 180 months. The range under this as contemplated under the guidelines was 188 to 235 months. The United States recommended a sentence at the high end of 235 months. United States probation. I'm sorry. I'm a little confused. You said that it was a mandatory minimum sentence. Correct. I had understood it to have been a basically traditional guideline sentence. He was convicted under the Armed Career Criminal Act, ma'am. Yeah. Which mandate under 924E. Yes. Which mandates a mandatory minimum of 15 years. Yes, but then. The judge, the U.S. probation under their guideline calculations had a range of 188 to 235 months. Which is the guidelines aspect. Yes, ma'am. Why isn't that aspect subject to anomaly and remand? The court did not give. If the court had gave a 188-month sentence, it would be unclear whether or not the judge could have gone lower. In this case, the judge did not go lower. He gave a mid-range sentence of 211 months. The government had asked for 235. I understand, but isn't that still discretionary? It is. It is. All right. So why isn't that aspect of it subject to anomaly and limited remand? There's enough information in the record that indicates that the judge exercised that discretion. While he did not go through and list all the factors under 3553A, there is no mandate that a judge shall have to do that as far as listing it out on the record. What it did demonstrate in the record, though, is that he did discuss what was fair and what was just. First, he didn't follow the government's recommendation. He went below U.S. probation's recommendation. But he did not go to the bottom end of the guidelines, which would have been 188, which would indicate that he felt that this individual was sympathetic. Secondly, he did state on the record that he took into consideration all the good works done by Mr. Avery while Mr. Avery had been in prison. Mr. Avery had quite a career in prison, and he spent a lot of time helping other prisoners while as a prisoner. He said, I've taken all this into consideration. In fact, he recommended that Mr. Avery have more of those opportunities. Mr. Avery does very well in a controlled environment and was very anxious to help others. So he says, I've taken all that into consideration. I also took into consideration a report that was done by a doctor. Mr. Avery was examined a couple times by mental psychologists to kind of explain his behavior and to explain why he sees the world in the way that he does. And the court gave that as mitigating factors. Had the court gone to 188 months... The only question I have is, at any time did he say if the guidelines were voluntary rather than mandatory, I would give the same sentence? No, sir, he did not. How do we know that he... how can we know with a cold record that he would have done this voluntarily, even if the guidelines weren't there? If the guidelines... if we were to believe that he would have given a lesser sentence, then we would have expected that he would have given the lowest possible sentence, which would have been 188 months. Well, how do you distinguish Ammaline? Ammaline is... well, Ammaline is... I guess I can't necessarily distinguish, because Ammaline does not tell us that... how to read a record, I guess is the best way to say it. What Ammaline tells us, unless we can show there's... show that there's plain air, we have to send it back to let the judge decide. You're swimming up a waterfall. Yes, sir. Take the hint. Yes, sir. I know, and I came fully prepared that that was very likely to happen. I guess the best argument that I can offer to the court is that, because the judge did not give the bottom end of the guidelines and took into contemplation the mitigating factors that a district judge now considers anyway, the only thing that he did not do, since this was a pre-Booker, pre-Ammaline sentence, was he didn't cite the magic language of 3553A. And I guess what I'm asking this court to do is to say that it's not necessary that the court has to come out and say the guidelines are only advisory and pursuant to 3553A. The sentence, it would appear that because simply the sentence that was given, a mid-range sentence, lower than the government's recommendation, lower than probation, but much higher than the bottom end. Now you're drowning in the pool below the waterfall. But keep going if you want. Keep going if you want. Well, taking the hint and not wanting to make things worse, let me see if I can take a little bit different track. I guess with the Ammaline, I guess there's just really no error that can be shown. Now, the court never stated that it felt bound by the guidelines. The bottom end of the range was 188, but it was an active sentence, mandatory minimum of 180 months. And I guess the recent case by the circuit, U.S. v. Dare, is one that talked about how Booker did not affect those mandatory minimums. With that being said, and seeing where this is already headed, I really appreciate your time, and thank you very much. All right. Thank you, counsel. Mr. Roy, you disappeared. I thought you were abandoning your time. I'm here, Your Honor. Thank you, Your Honor. I do believe, and I think this Court decision, Ammaline, has been upheld by Booker. I think it's pretty obvious that the Court agrees with that. I understand. However, there is one issue that I think that I need to raise. I don't expect that it should go anywhere, but as a lawyer, I need to raise it. There, I believe, is a policy that we do not consider prior convictions facts to be considered and by a jury under the Sixth Amendment in these kinds of cases. I look at that case law and can find no constitutional reason for that policy. Well, it's – whether that's so or not, it's crystal clear that we're bound by. I understand that that is the law as given to us by Apprendi and through Booker, but it is a consideration that needs to be raised. We recognize you've preserved the argument. All right. Thank you very much. All right. The matter just argued will be submitted, and we'll next hear argument in.
judges: Wallace, Trott, Rymer